IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JULIO MELENDEZ,

    Petitioner,

v.

RANDY GROUNDS,[1] Warden,

    Respondent.

No. C 12-0386 CRB (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner, a state prisoner incarcerated at California's Salinas Valley State Prison (SVSP), has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction from San Francisco County Superior Court. For the reasons that follow, the petition will be denied.

**I.    STATEMENT OF THE CASE**

On June 17, 2009, a jury convicted Petitioner of first degree murder with personal use of a firearm and of being a felon in possession of a firearm. In a bifurcated proceeding, the court found true the allegation that petitioner had served two prior prison terms and, on September 28, 2009, sentenced petitioner to 35 years to life in state prison.

On June 15, 2011, the California Court of Appeal affirmed the judgment of the trial court and, on September 21, 2011, the Supreme Court of California denied review.

---

[1] Randy Grounds succeeded Anthony Hedgpeth as SVSP's warden and therefore is substituted as the respondent in this action pursuant to Federal Rule of Civil Procedure 25(d).

On January 25, 2012, Petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254. The Court found the claims in the petition cognizable under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer to the order to show cause, but Petitioner did not file a traverse.

## II.     FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> On February 28, 1997, an indictment was filed against appellant alleging that he committed first degree murder with an enhancement for personal use of a firearm within the meaning of Penal Code section 12022.5, subdivision (a) (count one), and was a felon in possession of a firearm in violation of Penal Code section 12021, subdivision (a)(1) (count two). In connection with both counts, it was alleged that appellant had served two prior prison terms within the meaning of Penal Code section 667.5, subdivision (b).
>
> The indictment related to the fatal shooting of Jose Quesada (victim) at about 2:00 a.m. on November 21, 1996, on Woodward Street at 14th Street in San Francisco. In December 1997, codefendant Jose Fuentes was arrested for this murder. Fuentes later pleaded guilty to voluntary manslaughter and was jailed. Appellant, however, was not arrested until June 6, 2008, when he was discovered living in Virginia after being detained at a traffic stop and found in possession of a suspended California license in the name of Carlos Corvoa. Appellant was arraigned in California on July 2, 2008, and a jury trial began May 20, 2009.
>
> I. Jury Trial.
>
>     A. Karen Barranco.
>
> At trial, witness Karen Barranco testified that, on the night of the murder, she was in the car of her boyfriend, Juan Esparza, when a fight broke out at the El Toro nightclub parking lot. Barranco saw the victim arguing with several young men, two of whom she identified as appellant and codefendant Fuentes. According to Barranco, the fight then moved to Woodward Street just off 14th Street. She drove there with Juan Esparza and his brother, Ivan Esparza; appellant and Fuentes drove in a black Mustang; and the victim and his passenger, Gustavo Campos, followed in an old American car.
>
> After parking on 14th Street, Barranco, who remained in the car, saw the victim arguing with the Esparza brothers, appellant and Fuentes on Woodward Street. Barranco then saw the Esparza brothers, appellant and Fuentes walk towards 14th Street and heard gunshots from the corner of Woodward Street near 14th Street. She did not see anyone with a gun, or see from where the gunshots were fired. She left the scene when the Esparzas and Campos ran to the car and they drove off. Their car was later pulled over by police for driving the wrong way down 14th Street.
>
>     B. Juan Esparza.
>
> Juan Esparza, who knew appellant, Fuentes and the victim, confirmed Fuentes and the victim were fighting at the El Toro nightclub before leaving in

2

separate cars to fight one-on-one on Woodward Street. Fuentes had a gun in his hand and was playing around with it, showing it to people. This prompted Esparza to enter a nearby ground-floor apartment to summon Fuentes's friends to help calm him down. Esparza left the apartment after hearing about four gunshots, at which point Fuentes pointed a gun at him and his brother. Esparza grabbed the gun from Fuentes and beat him with it before discarding it and leaving the scene.

At trial, Esparza testified that, as he left the scene, he saw appellant holding a gun. He did not recall telling police on the night in question that he did not see who ran off with a gun and was not present when the victim was shot.

C. Alvaro Vargas.

Alvaro Vargas testified that, when he was on Woodward Street at about 2:00 a.m. on the night in question, he saw a group of people gathered up the street. Vargas then saw a man walk down from 13th Street toward the crowd, and saw two other men enter a gate as the first man passed. Next, Vargas saw two men exit the gate and, with their backs turned away from him, shoot the man who walked past the gate. Vargas gave inconsistent testimony regarding whether the two men he saw enter the gate were the same two men who later exited the gate and fired the shots. He also testified that he did not recall where the shooters went after the shooting, yet told police shortly after the shooting that he was positive the shooters reentered the gate. The only physical characteristic of the shooters that Vargas could provide was that one had "wet-like wavy hair" or "straight wavy hair, gelled." Before the grand jury, Vargas testified appellant's hair matched this description; yet at trial he testified appellant's hair differed.

D. Ana Barrera.

Ana Barrera, who lived at 14th and Woodward Streets, was awoken in the early morning on the day of the murder by four or five gunshots. She jumped to the floor from her bed by the window and heard a man say in Spanish: "I dropped the stupid thing," and "Julio, give me the gun." She looked out the window and saw a man walking around in circles, saying in a different voice: "Don't kill me." She also heard squealing tires and saw two people standing next to a fence across the street, several people running and a car driving off.

E. Yasenia De Leon.

Yasenia De Leon, the live-in girlfriend of codefendant Fuentes, testified that, on the night in question, she was home when someone called to tell her there had been an "accident, a shooting," and that she needed to go to the hospital to identify Fuentes, who was beaten up. Following Fuentes's arrest, on December 10, 1997, De Leon was interviewed by police, a transcript of which was read to the jury.

According to the interview transcript, De Leon initially denied knowing appellant or about the shooting. At some point, police stopped their questioning and put her in a room with Fuentes. After talking to Fuentes, De Leon acknowledged to police that Fuentes had told her that he shot the victim while drunk following a fight at the El Toro, but said it was appellant who

3

actually killed him by shooting him in the head. Afterward, Fuentes was attacked and beaten by the victim's friends.

De Leon also told police that she, Fuentes and their daughter went to El Salvador between December 1996 and June 1997, and that, while there, they saw appellant. De Leon heard appellant discussing the shooting with Fuentes. In this conversation, appellant admitted shooting the victim and regretting it.

At trial, De Leon repudiated her previous statements to police. De Leon claimed the police treated her like a criminal during the interview, and that she and her daughter had been hungry and scared. At some point, she was placed in a room with Fuentes, who told her to tell police what they wanted to hear to avoid being deported.

F. Appellant's Pre-Trial Statements.

Appellant was interviewed by police on June 27, 2008, shortly after his return from Virginia. Appellant acknowledged attending a dance at El Toro on the night of the murder, and that someone began "looking for trouble" with the victim. He also acknowledged leaving El Toro and driving to Woodward Street with several other vehicles, at which point someone entered a house and returned with a weapon. A short while later, shots were fired. Appellant, however, denied having or firing a gun. When the officer expressed disbelief and told appellant that witnesses had seen him with a gun, appellant responded that, whether or not they believed him, he had nothing else to tell them.

II. The Verdict and Sentencing.

On June 17, 2009, the jury convicted appellant of first degree murder and being a felon in possession of a firearm, and found true the enhancement for personal use of a firearm. In a bifurcated proceeding, the trial court found true the allegation that appellant had served two prior prison terms. After denying appellant's new trial motion, the trial court sentenced him to a total indeterminate term of 35 years to life in prison.

People v. Melendez, No. A126528, 2011 WL 2350307, at *1-3 (Cal. Ct. App. June 15, 2011) (footnotes omitted).

## III.  LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

4

1 presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' 2 clause, a federal habeas court may grant the writ if the state court arrives at a conclusion 3 opposite to that reached by [the Supreme] Court on a question of law or if the state court 4 decides a case differently than [the] Court has on a set of materially indistinguishable facts." 5 Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application 6 clause,' a federal habeas court may grant the writ if the state court identifies the correct 7 governing legal principle from [the] Court's decisions but unreasonably applies that principle 8 to the facts of the prisoner's case." Id.

9 "[A] federal habeas court may not issue the writ simply because the court concludes in 10 its independent judgment that the relevant state-court decision applied clearly established law 11 erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. 12 A federal habeas court making the "unreasonable application" inquiry should ask whether the 13 state court's application of clearly established federal law was "objectively unreasonable." 14 Id. at 409. The only definitive source of clearly established federal law under 28 U.S.C. 15 § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of 16 the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). 17 While circuit law may be "persuasive authority" for purposes of determining whether a state 18 court decision is an unreasonable application of Supreme Court precedent, only the Supreme 19 Court's holdings are binding on the state courts and only those holdings must be 20 "reasonably" applied. Clark, 331 F.3d at 1069.

21 Finally, a federal court must consider whether any constitutional error at trial "had 22 substantial and injurious effect or influence in determining the jury's verdict," because 23 petitioners "are not entitled to habeas relief based on trial error unless they can establish that 24 it resulted in 'actual prejudice.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citations 25 omitted).

26 **IV.   DISCUSSION**

27 Petitioner presents four claims for federal habeas relief. First, Petitioner claims that 28 the trial court committed prejudicial error by admitting Barrera's testimony, including

5

alleged hearsay, in violation of Petitioner's constitutional right to confront the witnesses against him.  Pet. at A1.  Second, Petitioner claims that the trial court committed prejudicial error by declining to grant a mistrial after Inspector Gordon improperly described the case as "gang-related," and that this error deprived Petitioner of his constitutional right to due process.  Pet. at B1, B3-B4.  Third, Petitioner claims that his trial attorney provided ineffective assistance in failing to object to inadmissible testimony.  Pet. at C1.  Finally, Petitioner claims that the prosecutor's improper reference to Petitioner's silence violated Petitioner's rights to due process and not to testify, and that Petitioner's trial attorney's failure to object to this reference constituted ineffective assistance.  Pet. at D1-D3.  The claims are without merit.

**A.  The Trial Court's Admission of Barrera's Testimony Did Not Violate Petitioner's Right to Confront the Witnesses Against Him**

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right "to be confronted with witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause applies to all "testimonial" statements, including "testimonial hearsay" or out of court statements.  Crawford v. Washington, 541 U.S. 36, 50-51 (2004).  "[T]he basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross examine the declarant about statements taken for use at trial."  Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011) (emphasis added).  "[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.'"  Williams v. Illinois, 132 S. Ct. 2221, 2243 (2012) (quoting Bryant, 131 S. Ct. at 1155).  In Bryant, for example, the Supreme Court held that a shooting victim's answers to police questions were not testimonial and therefore outside the scope of the Confrontation Clause because the victim provided his answers "to enable police assistance to meet an ongoing emergency," not for the primary purpose of serving as evidence at trial.  Bryant, 131 S. Ct. at 1166-67.

/

/

/

Petitioner challenges the admission of Barrera's trial testimony because Petitioner was unable to confront and cross examine the unidentified declarant[2] who, according to Barrerra, "said, 'Oh, I dropped that thing,' and then, 'Julio, hand me the gun.'" Rep.'s Tr. ("RT") (dkt. 11 ex. B) at 616, 619.[3] Petitioner objected to the statement as hearsay on direct appeal. The California Court of Appeal accordingly rejected the claim on that basis without explicitly addressing the Confrontation Clause. See Melendez, 2011 WL 2350307, at *3-5. But the Confrontation Clause claim is clearly without merit because the statement at issue is plainly not "testimonial" within the meaning of Crawford, Bryant, and Williams. The declarant's request for a gun was not "made for 'the primary purpose of creating an out-of-court substitute for trial testimony.'" Williams, 132 S. Ct. at 2243 (quoting Bryant, 131 S. Ct. at 1155). The "primary purpose" of the statement instead was to obtain a gun. Under the circumstances, the trial court's admission of Barrera's testimony regarding the declarant's statement did not violate Petitioner's rights under the Confrontation Clause. See id.

Looking beyond the Confrontation Clause, the question of whether "evidence was incorrectly admitted . . . pursuant to California law" ordinarily is "no part of a federal court's habeas review." Estelle v. McGuire, 502 U.S. 62, 67 (1991). Even if the California Court of Appeal erred in its determination that the "declarant's statement . . . meets the statutory requirements for the spontaneous statement [hearsay] exception," Melendez, 2011 WL 2350307, at *5, such an error would not justify federal habeas relief unless it "violated fundamental due process and the right to a fair trial," Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).

---

[2] To be clear, Petitioner does not argue that he was unable to confront and cross examine Barrera, who testified as a witness for the prosecution at Petitioner's trial. See Pet. at A2-A3. Petitioner's trial counsel cross examined Barrera at trial. See RT at 730-59.

[3] The quotation used here is from Barrera's testimony in front of the jury. RT at 619. There is some uncertainty as to the exact translation of the declarant's statement. The precise meaning of "babosada," id. at 263, which caused difficulty for the interpreter and has been variously translated as "that thing," "this silly thing," "the thing," and "the stupid thing," is not material to the Court's determination of the Confrontation Clause or hearsay questions. See id. at 263, 619; Pet. at A1; Melendez, 2011 WL 2350307, at *2.

The Court is satisfied that there was no error here, much less an error that "so fatally infected [the] trial as to render it fundamentally unfair." Id. California evidence law permits the admission of statements made under "stress of excitement" and relating to the cause of such excitement. Cal. Evid. Code § 1240. As noted by the California Court of Appeal, "[t]he foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury." Melendez, 2011 WL 2350307, at *5 n.3 (quoting People v. Poggi, 45 Cal. 3d 306, 318 (1988)). The record shows that Barrera testified to hearing gunshots immediately before the statement in question. RT at 613. Under the circumstances, the California Court of Appeal reasonably found that the gunfire would cause sufficient excitement to support the hearsay exception. Petitioner's argument that "there was no evidence that the declarant had heard the preceding gunshots," Pet. at A4, is without merit. Barrera's testimony that she heard gunshots "coming from the street" loud enough to wake her from sleep supports the reasonable inference that the declarant, whom she also heard outside her window, also heard the gunshots. See RT at 612.

The state courts' rejection of Petitioner's claim that the admission of Barrera's testimony violated the Confrontation and Due Process clauses was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Petitioner is not entitled to federal habeas relief on this claim.

### B. The Trial Court Adequately Remedied Inspector Gordon's Improper Characterization of the Case as "Gang-Related"

Petitioner claims that the trial court's refusal to grant a mistrial due to improper police testimony violated his due process right to a fair trial. But the claim is without merit because the trial court's curative instruction to the jury neutralized any prejudice and the improper testimony was not so prejudicial as to violate due process.

The trial court granted Petitioner's pretrial motion in limine to exclude all gang-related evidence, and ordered counsel to give notice before using the word "gang" and to so advise all witnesses. Melendez, 2011 WL 2350307, at *5. San Francisco Police Inspector

Armand Gordon nevertheless characterized the case as "gang-related" in response to a question asked by a juror and posed to Inspector Gordon by the court. RT at 1150, 1159.[4] The trial court immediately consulted with counsel, instructed the jury to disregard Inspector Gordon's statement in its entirety, and explained that, per the parties' stipulation, Petitioner's trial was not a gang-related case. Id. at 1159-60. Later, the trial court issued the following special jury instruction:

> There is no evidence that the murder of Jose Quesada was gang related. You heard the testimony of retired homicide inspector Armand Gordon. Mr. Gordon gave speculative and improper testimony. This testimony was stricken. You may consider this as a factor while weighing his credibility.

CT (dkt. 11 ex. A) at 229.

It is well established that "there is a strong presumption that the court's curative instruction was followed by the jury." Mancuso v. Olivarez, 292 F.3d 939, 952 (9th Cir. 2002). Consequently, it is only in "extreme situations [that] curative instructions will not neutralize the prejudice when evidence is improperly admitted." Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997) (giving example of case where trial judge suggested that firearms defendant was a murderer and a child molester).

The case at hand is similar to Mancuso v. Olivarez, a Ninth Circuit habeas case where, despite the trial court prohibiting any reference to Mancuso's parole status, a detective testified to performing a "parole search" at Mancuso's apartment. 292 F.3d at 950. The trial judge reprimanded the detective outside of the presence of the jury and, despite expressing concern that the improper testimony "jeopardized the entire trial," ultimately denied a motion for a mistrial and "carefully instructed the jury to ignore [the detective's] statement." Id. at 950-51. The Ninth Circuit denied habeas relief on this issue, relying in part on the curative

---

[4] "THE COURT: All right. At the time that you interviewed Miss De Leon did you think that she knew about the Quesada homicide? THE WITNESS: Yes. . . . Also we find that significant others or wives usually know what is going on with their significant other. And in this case being as it was gang-related, we felt that they definitely know what is going on because they are involved in all aspects of life with their significant other. THE COURT: Let me see the—let me see counsel at the bench." RT at 1159. De Leon was the live-in girlfriend of Petitioner's codefendant Jose Fuentes. Melendez, 2011 WL 2350307, at *2.

9

1    instruction and in part on the conclusion that any prejudicial effect was "diluted by the
2    copious [other] testimony" at trial.  <u>Id.</u> at 952.

3         Here, like in <u>Mancuso</u>, the improper testimony consisted of a fleeting reference to an
4    issue that might have been prejudicial, but was not an element of the crime.  <u>See id.</u> at 950.
5    Also like in <u>Mancuso</u>, the trial court here reprimanded Inspector Gordon outside of the
6    presence of the jury, RT at 1162-65, and carefully instructed the jury to disregard Inspector
7    Gordon's statement, RT at 1159-60, Clerk's Tr. ("CT") (dkt. 11 ex. A) at 229.  <u>Accord</u>
8    <u>Mancuso</u>, 292 F.3d at 950-51.  The trial court's explanation that Inspector Gordon's
9    testimony was "speculative" and that "[t]here is no evidence that the murder of Jose Quesada
10   was gang related," CT at 229, may have been particularly effective in that it gave the jury a
11   reason to believe that the case was actually not gang-related, as opposed to merely asking the
12   jury to turn a blind eye to <u>evidence</u> of gang involvement.  And although Petitioner's trial was
13   not as lengthy as Mancuso's, Inspector Gordon was one of fifteen witnesses to testify, <u>see</u> RT
14   Index, and his remark – which the court instructed the jury to disregard – appears to be the
15   only testimony front of the jury to refer to gangs.  <u>See</u> <u>Melendez</u>, 2011 WL 2350307, at *7
16   ("[W]e have a lone reference to possible gang involvement at the end of a lengthy trial, at
17   which many other witnesses testified in compliance with the order."); RT at 1180
18   ("[C]ertainly, there has been no mention of gang evidence by any of the other witnesses.").

19        Under the circumstances, the California Court of Appeal reasonably rejected
20   Petitioner's claim on the ground that this case involved "no . . . 'exceptional circumstance'
21   rendering the trial court's curative instructions powerless."  <u>Melendez</u>, 2011 WL 2350307, at
22   *7.  As in <u>Mancuso</u>, "[a]ny prejudice that might have occurred as a result [of the improper
23   testimony] was diluted by the copious testimony and satisfactorily ameliorated by the
24   curative instruction."  292 F.3d at 952.

25        Petitioner is not entitled to federal habeas relief on this claim.  The state court's
26   rejection of th claim was not contrary to, or an unreasonable application of, clearly
27   established Supreme Court precedent, or involved an unreasonable determination of the facts.
28   <u>See</u> 28 U.S.C. § 2254(d).

### C. Petitioner's Ineffective Assistance of Counsel Claims Do Not Warrant Federal Habeas Relief

Petitioner claims that his trial counsel violated his Sixth Amendment right to effective assistance of counsel in two ways. First, Petitioner claims that trial counsel was ineffective in failing to object to Inspector Gordon's testimony that he believed De Leon was telling the truth when she incriminated Petitioner. Pet. at C1-C2. Second, Petitioner claims that trial counsel was ineffective in failing to object to Inspector Joseph Toomey's testimony regarding the circumstances in which Inspector Toomey would lie to a suspect. Pet. at C2-C4. The claims are without merit.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 687-88 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted). Further, even when counsel's conduct falls short of this standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Harrington v. Richter, 131 S. Ct. 770, 787-88 (2011) (citations and internal quotation marks omitted). "The likelihood of a different result must be substantial, not just conceivable." Id. at 792.[5]

---

[5] "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Harrington, 131 S. Ct. at 792 (quoting Strickland, 466 U.S. at 693, 697).

11

When a federal court reviews an ineffective assistance claim in the context of habeas corpus, the standard is "doubly deferential," in that the court owes deference both to the attorney's decisions at trial and to the state court's decision that the attorney's conduct did not violate Strickland. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). Both standards are "highly deferential." Harrington, 131 S. Ct. at 788. In this context, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

        1.    Failure to Object to Inspector Gordon's Testimony Does Not Warrant Habeas Relief

Petitioner claims that his trial counsel was ineffective in failing to object to Inspector Gordon's testimony about De Leon's truthfulness. Like Inspector Gordon's comment that the case was "gang-related," this testimony was in response to a question from the jury, posed to Inspector Gordon by the trial judge. RT at 1150, 1156. The relevant testimony is as follows:

> THE COURT: And how would you describe Miss De Leon's demeanor during the evening when while she was at the Homicide Detail? Was she cooperative, uncooperative? Any other adjective that you can use to describe her demeanor?
>
> THE WITNESS: I would say initially she was uncooperative – un– not cooperative. She was comfortable, but she wasn't really telling us the truth. I would say that her demeanor after her eating and meeting with Mr. Fuentes was a little bit different. She was a little bit more forthcoming. She did tell us the truth.

Id. at 1156.

The California Court of Appeal noted that "[l]ay opinion about the veracity of particular statements by another is inadmissible" in California courts. Melendez, 2011 WL 2350307, at *8 (quoting People v. Melton, 44 Cal. 3d 713, 744 (1988)). But it nonetheless found "insufficient evidence of professional incompetence to permit [Petitioner] to overcome the 'strong presumption' that his counsel's conduct was 'sound trial strategy' or otherwise 'within the wide range of reasonable professional assistance.'" Id. at *9. The court further found that "even assuming Inspector Gordon's testimony . . . was improper, [Petitioner] has failed to prove the testimony was prejudicial to his case." Id. Given that De Leon's

12

statements to the police "changed dramatically from vague denials of any knowledge of the murder or [Petitioner] to very detailed admissions regarding [Petitioner's] confession of the murder to Fuentes in El Salvador," the court "[could] not conclude there is a reasonable probability that appellant would have prevailed at trial had defense counsel objected to Inspector Gordon's statement." Id.

The California Court of Appeal's rejection of Petitioner's claim was not an objectively unreasonable application of Strickland. See Williams, 529 U.S. at 409, 411. "An attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective." Morris v. California, 966 F.2d 448, 457 (9th Cir. 1991). Here, defense counsel reasonably might have believed an objection would only draw additional attention to Inspector Gordon's assessment of De Leon's credibility, or that lodging an objection while the judge posed questions from the jury to a witness could risk drawing the disfavor of the judge or jury. The court of appeal noted that defense counsel also might have believed "that De Leon's drastically changed testimony was, by itself, sufficient to undercut her credibility," and that an objection would therefore be fruitless even if sustained. Melendez, 2011 WL 2350307, at *9. On habeas review, this Court must ask "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788. Under the circumstances, the California Court of Appeal's determination that "there simply is insufficient evidence of professional incompetence . . . to overcome the 'strong presumption' [of competence]," Melendez, 2011 WL 2350307, at *9 (citation omitted), was not objectively unreasonable in this case. See 28 U.S.C. § 2254(d).

The California Court of Appeal's additional determination that Petitioner failed to demonstrate prejudice was not objectively unreasonable either. See id. De Leon's statements to the police were contradictory, and a jury reasonably could have credited her "very detailed admissions regarding [Petitioner's] confession" over her "vague denials of any knowledge of the murder." Melendez, 2011 WL 2350307, at *9. The jury also received instruction that "[y]ou alone, must judge the credibility or believability of witnesses." CT at 225. This Court cannot say that there is a "substantial, not just conceivable" likelihood that

13

1  the jury would have reached a different decision had defense counsel objected, much less that
2  the California Court of Appeal "unreasonably" applied Strickland in rejecting Petitioner's
3  ineffective assistance of counsel claim.  See Harrington, 131 S. Ct. at 792.  Petitioner is not
4  entitled to federal habeas relief on this claim.

      2.  Failure to Object to Inspector Toomey's Testimony Does Not Warrant Habeas Relief

  San Francisco Police Inspector Joseph Toomey testified at trial that during an interview with Petitioner, Inspector Toomey lied when he said he believed that Petitioner shot Quesada in self defense.  RT at 1202-03.  When the prosecutor asked if there are "limits to the type of lies [Inspector Toomey would] tell during interviews," Inspector Toomey responded that he "would never lie to someone to have an innocent person tell you an untruth."  Id. at 1203.  Petitioner argues that trial counsel was ineffective in failing to object to this statement on the ground that it "was tantamount to opinion testimony that [Petitioner] was guilty."  Pet. at C3; see, e,.g., United States v. Espinosa, 827 F.2d 604, 612 (9th Cir. 1987) ("A witness . . . may not give a direct opinion on the defendant's guilt or innocence.").

  The California Court of Appeal reasonably concluded that Inspector Toomey's testimony was admissible because "[t]he jury . . . could reasonably be expected to understand that Inspector Toomey's testimony was offered to explain his interrogation technique rather than to opine on appellant's guilt."  Melendez, 2011 WL 2350307, at *10.  Contrary to Petitioner's argument, Inspector Toomey's opinion as to Petitioner's guilt is not a "necessary corollary" of his testimony.  See Pet. at C4.  The prosecutor asked Inspector Toomey to explain "the type of lies" that he would use in an interview, not the people he would tell a lie to.  See RT at 1203.  In the context of the prosecutor's question, Inspector Toomey's testimony can reasonably be understood to mean that, in accordance with California jurisprudence on police interrogations, he would not tell a lie that is so coercive that it would be likely to elicit a false confession.  See People v. Maury, 30 Cal. 4th 342, 411 (2003) ("The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.").  Inspector Toomey did not say that he would never lie to someone he believed to be innocent;

14

1 thus the fact that he lied to Petitioner does not demonstrate that Inspector Toomey believed
2 Petitioner to be guilty.

Petitioner's claim that his trial counsel was ineffective in failing to object to Inspector Toomey's testimony fails because petitioner has not "affirmatively prove[n] prejudice." Strickland, 466 U.S. at 693. Petitioner has not shown that (1) had his counsel objected, it is reasonable that the trial court would have sustained the objection as meritorious; and (2) had the objection been sustained, it is reasonable that there would have been an outcome more favorable to him. See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999). Petitioner is not entitled to federal habeas relief on this claim. The state courts' rejection of the claim cannot be said to be an objectively unreasonable application of Strickland. See 28 U.S.C. § 2254(d).

### D. The Prosecutor's Closing Statement Did Not Violate Clearly Established Federal Law

Petitioner claims that the prosecutor violated his Fifth and Fourteenth Amendment rights by calling attention to his decision to "clam up" during a police interview, and that trial counsel's failure to object to this reference amounted to ineffective assistance of counsel. Petitioner primarily relies on the Supreme Court's decisions in Griffin v. California, 380 U.S. 609 (1965), and Doyle v. Ohio, 426 U.S. 610 (1976).

In Griffin, the Court held that "the Fifth Amendment, . . . in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. at 615. Griffin condemns "comment on the refusal to testify," not comment on out of court statements or any lack thereof. Id. at 614 (emphasis added); see also Jenkins v. Anderson, 447 U.S. 231, 235 (1980) ("The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution for [sic] commenting on the silence of a defendant who asserts the right." (emphasis added)).

In Doyle, the Court held "that the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619.

15

1    Here, the record shows that Inspector Toomey interviewed Petitioner while Petitioner
2 was in custody after being returned from Virginia. See RT at 1193-94. Inspector Toomey
3 advised Petitioner of his Miranda rights, which Petitioner waived. Id. at 1196-97; CT at 129.
4 After a discussion about the night of the shooting, Petitioner eventually stated, "I can't say
5 anything more because . . . That's the version I have, I don't have another version,"[6] and
6 declined to provide additional information. CT at 133. The prosecutor expressed intent to
7 present Petitioner's refusal to answer additional questions as evidence of guilt, but the trial
8 court ruled that any reference to Petitioner's silence as evidence of guilt would be overly
9 prejudicial. RT at 1091 (citing Cal. Evid. Code § 352). The prosecutor nevertheless
10 suggested during closing argument and rebuttal that much of Petitioner's conduct after the
11 shooting, including Petitioner "clamming up" during the police interview,[7] was inconsistent
12 with innocence. Id. at 1474-87, 1492-93, 1648-51.

13   The prosecutor's statement that Petitioner "clammed up" during the police interview
14 is not a violation of the constitutional right considered in Griffin because the prosecutor did
15 not call attention to Petitioner's decision not to testify at trial, but instead only to Petitioner's
16 behavior out of court. See Griffin, 380 U.S. at 614. Petitioner nonetheless suggests that the
17 prosecutor's statement "impliedly invite[d] the jury to consider [Petitioner's] failure to
18 testify." Pet. at D2-D3. This argument, which Petitioner does not explain in detail, is
19 perhaps based on the possibility that the jury might see a parallel between Petitioner's
20 "clamming up" during his police interview and Petitioner's decision not to testify at trial.
21 See id.

22   The Supreme Court has explained that Griffin only "addressed prosecutorial comment
23 which baldly stated to the jury that the defendant must have known what the disputed facts
24 were, but that he had refused to take the stand to deny or explain them." United States v.

---

26 [6] Petitioner's responses have been translated from Spanish in the transcript of his interview. RT at 1198-99. A Spanish-speaking police inspector served as an interpreter during the interview. Id. at 1196-97.

28 [7] "Then he ends up, basically, clamming up, okay? 'That is all I have got to say.' What innocent person would do that? . . . Innocent people don't behave that way." RT at 1651.

16

1 Robinson, 485 U.S. 25, 32 (1988).  It did not clearly establish that a defendant's Fifth
2 Amendment rights are violated by prosecutorial comments that are merely amenable to the
3 sort of inferential leap Petitioner suggests here.  See id.  Because federal courts can grant
4 habeas relief only when a state court's decision conflicts with "clearly established" Supreme
5 Court precedent, 28 U.S.C. § 2254(d), Griffin cannot provide the basis for federal habeas
6 relief here.

    Doyle is a more appropriate framework for considering the appropriateness of a prosecutorial reference to the out-of-court conduct at issue here.  But Doyle is fundamentally concerned with protecting a defendant's ability to invoke his Miranda rights without fear that those rights will be used against him, see 426 U.S. at 617-19, and Petitioner waived (rather than invoked) his Miranda rights during the interview, RT at 1196-97, CT at 129.[8]

    The Supreme Court has held that a defendant must make a "simple, unambiguous statement" in order to "invoke[] his right to cut off questioning" under Miranda and its progeny.  Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010) (citations and internal quotation marks omitted).  Specifically, a defendant can "say that he want[s] to remain silent or that he d[oes] not want to talk with the police."  Id.  But Petitioner instead told the police, "I can't say anything more because . . . That's the version I have, I don't have another version."  CT at 133.  The California Court of Appeal reasonably determined that Petitioner's statement "could fairly be read as communicating to police his assertion that the explanation he already gave was truthful and that he was sticking to it," and therefore "consistent with his initial waiver rather than a belated invocation of his Fifth Amendment right to silence." Melendez, 2011 WL 2350307, at *12.  The court of appeal accordingly concluded that the

---

[8] Inspector Toomey began the interview by explaining, "You have the right to remain silent. Do you understand?" CT at 129. Petitioner responded, "Si. Yes." Id. Following a series of additional questions to confirm that Petitioner understood his Miranda rights, including discussion that suggests Petitioner may have been confused about when he could speak to an attorney, Inspector Toomey explained as follows: "No, no, you have the right to an attorney, and you have a right to have him here, present, and if you can't afford one, we'll appoint one for you. But the decision you have to make is do you want to tell us your side of the story before you have your attorney? This is totally up to you." Id. Petitioner responded, "Well, I can tell you the version that I know," and proceeded to answer a series of questions about the night of the shooting. Id. Petitioner does not challenge the sufficiency of his Miranda warning and waiver.

17

prosecutor's reference to the statement did not violate Doyle. See id. Under the circumstances, the state court's rejection of Petitioner's claim was not "objectively unreasonable." Williams, 529 U.S. at 409.

The claim further fails for lack of prejudice. Petitioner's "clamming up" was only one of many reactions that the prosecutor highlighted in her closing argument as inconsistent with innocence. Among other things, she highlighted Petitioner's evasive and contradictory answers to Inspector Toomey before Petitioner decided that he had nothing more to say. RT at 1474-87, 1492-93, 1648-51. The prosecutor also argued that Petitioner lied about his identity when pulled over for a traffic infraction in Virginia, id. at 1487, changed his story between not having a gun and feeling that he was threatened, id. at 1484, and questioned how witnesses "can . . . be sure" they saw him with a gun rather than continuing to deny having a gun, id. at 1485. Even if the prosecutor's comment about Petitioner "clamming up" was error under Griffin and/or Doyle, it cannot be said that the comment "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (citations and internal quotation marks omitted). The jury was presented with plenty of other legitimate reasons within the closing argument to find that Petitioner did not act like an innocent person. Petitioner is not entitled to federal habeas relief on his prosecutorial misconduct claim. See 28 U.S.C. § 2254(d).

Nor is Petitioner entitled to federal habeas relief by recasting his claim as one of ineffective assistance of counsel, i.e., "to the extent defense counsel failed to fully preserve this argument on appeal, his failure to object was ineffective assistance of counsel." Pet. at D1. For essentially the same reasons noted above, it cannot be said that (1) had counsel objected, it is reasonable that the trial court would have sustained the objection as meritorious; and (2) had the objection been sustained, it is reasonable that there would have been an outcome more favorable to Petitioner. See Wilson, 185 F.3d at 990. Petitioner is not entitled to federal habeas relief on this claim.

/

/

## V. CONCLUSION

After a careful review of the record and pertinent law, the Court is satisfied that the petition for a writ of habeas corpus must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) also is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: April 17, 2013

CHARLES R. BREYER
United States District Judge